**IN THE UNITED STATES DISTRICT COURT,**
**EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| **RICHARD PROVINCE,** | ) | |
| *individually and on behalf of* | ) | **Case No. 4:24-cv-00339-MTS** |
| *all others similarly situated,* | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **v.** | ) | |
| | ) | |
| **TARGET CORPORATION, and** | ) | |
| **DOES 1 through 10,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Richard Province, individually and on behalf of all others similarly situated, hereby files this First Amended Class Action Complaint, against Target Corporation and DOES 1 through 10 (collectively "Defendants") for their false, misleading, and deceptive marketing of their products constituting breach of warranty, breach of implied contract, and unjust enrichment, and, in the state of Missouri, violations of the Missouri Merchandising Practices Act, Mo. Rev. Stat. chap. 407 ("MMPA").

## I.      INTRODUCTION

1.      Defendants market and sell consumer health products, including over-the-counter cough and flu medicines, branded "Up & Up," that are prominently advertised as being "Non-Drowsy" despite containing dextromethorphan hydrobromide ("DXM") – a substance scientifically proven to cause drowsiness.

2.      In other words, the products are deceptively, misleadingly, and dangerously marketed as being "Non drowsy," despite containing DXM, which is widely acknowledged by medical experts to *cause* drowsiness. Defendants' "Up & Up"-branded, DXM-containing, falsely-labeled "Non-Drowsy" cold and flu medicines (the "Products") are therefore sold in violation of Missouri law.

1

3.      Defendants' falsely-labeled "Non Drowsy" Products state prominently on the front of their labels that they are "Non-Drowsy."  That false "Non Drowsy" claim is sometimes further enhanced by the juxtaposition of the Products with their "night time" counterparts.  By prominently labeling these products as "Non-Drowsy," Defendants led Plaintiff and other reasonable consumers to believe that the Products do not cause drowsiness, and that drowsiness cannot be a side effect of the Products.  To the contrary, however, drowsiness *is,* in fact, a *well-known* side effect of DXM.

4.      Nonetheless, Defendants use the false and misleading "Non-drowsy" claim to portray their Products as more valuable to buying consumers.  The vast majority of consumers do not want to experience drowsiness or risk drowsiness during the day. Indeed, in addition to being inconvenient, unexpected drowsiness could be extremely dangerous in a variety of circumstances.  Nonetheless, knowing consumers prefer *actual* "Non Drowsy" products, Defendants created the false and misleading "Non drowsy" claim to portray the Products as having a unique and positive quality that differentiates them from competitor products.

5.      Pursuant to the MMPA, such practice is illegal.

6.      In addition, and/or in the alternative to the above, since the initial offering of the Products, each and every container of the Products has borne a uniformly-worded label falsely claiming the Product is "Non drowsy."  That uniformly-worded false statement gives rise to additional and/or alternative claims under Missouri law.

## II.      PARTIES, JURISDICTION, AND VENUE

7.      Plaintiff Richard Province is a citizen and resident of St. Louis County, Missouri.

8.      Plaintiff brings this Class Action Petition individually and on behalf of a putative class of Missouri residents, and/or a putative subclass of consumers from certain states, the "Consumer Protection Subclass."

9.      Defendant Target Corporation is a Minnesota corporation having its principal place of

business in Minnesota.

10.     The true names and capacities of the Defendants sued herein as DOES 1 through 10, inclusive, are currently unknown to Plaintiff, who therefore sues such Defendants by fictitious names. Each of the Defendants designated herein as a DOE is legally responsible for the unlawful acts alleged herein.  If necessary, Plaintiff will seek leave of Court to amend the Petition to reflect the true names and capacities of the DOE Defendants when such identities become known.

11.     Defendants, directly and through their agents, have substantial contacts with, and receive substantial benefits and income from and through the State of Missouri.  Defendants are the owners, manufacturers, and distributors of the Products, and the entities that created and/or authorized the false, misleading, and deceptive packaging of the Products.

12.     Venue is proper in this Court because Plaintiff was injured in this venue and lives within this venue.

13.     This asserted class action comports with Missouri Supreme Court Rule 52.08 and with R.S.Mo. § 407.025(3) of the MMPA.  Plaintiffs' identities can be ascertained from Defendant's records, but are so numerous that simple joinder of all individuals is impracticable.  This action raises questions of law and fact common among Plaintiffs.  The claims of lead Plaintiff is typical of all Plaintiffs' claims. Named Plaintiff will fairly and adequately protect all Plaintiffs' interests, and is represented by attorneys qualified to pursue this action. More specifically:

14.     Class definitions:  Plaintiff brings this action on behalf of Plaintiff and a class of similarly-situated persons preliminarily-[1]defined as follows: All persons who purchased the Products[2]

_____

[1] Plaintiff reserves the right to propose, as needed, any different or other more- or less-specific class, classes, subclass, or subclasses as Plaintiff deems appropriate for purposes of class certification. Included within this reservation is a potential subclass of those citizens in those states having consumer protection laws materially-similar to the MMPA: Illinois, Maryland, Hawaii, New York, Washington D.C., Rhode Island, Vermont, Washington, and Connecticut ("Consumer Protection Subclass").  Each state therein has a consumer protection statute that broadly prohibits deceptive conduct; likewise, no

during the Class Period while in one of the specific states having consumer protection statutes materially-identical to the MMPA: Illinois, Maryland, Hawaii, New York, Washington D.C., Rhode Island, Vermont, Washington, and Connecticut ("Consumer Protection States").  In addition, and/or alternatively, Plaintiff brings this action on behalf of herself and a Missouri subclass of similarly-situated persons defined as follows: All persons, who, within the Class Period, purchased the Products in the State of Missouri.  The Class Period begins five years prior to the date of the filing of this Petition, and ceases upon the date of the filing of this Petition. Excluded from the Class and Subclass are: (a) any judges presiding over this action and members of their staffs and families; (b) the Defendants and their subsidiaries, parents, successors, and predecessors; any entity in which the Defendants or their parents have a controlling interest; and the Defendants' current or former officers and directors; (c) employees (i) who have or had a managerial responsibility on behalf of the organization, (ii) whose act or omission in connection with this matter may be imputed to the organization for liability purposes, or (iii) whose statements may constitute an admission on the part of the Defendants; (d) persons who properly execute and file a timely request for exclusion from the class; (e) the attorneys working on the Plaintiffs' claims; (f) the legal representatives, successors, or assigns of any such excluded persons; and (g) any individual who assisted or supported the wrongful acts delineated herein.

15.     <u>Numerosity</u>:  Upon information and belief, the Class includes thousands of individuals on a statewide basis, making their individual joinder impracticable.  Although the exact number of Class members and their addresses are presently unknown to Plaintiff, they are ascertainable from Defendants' records.

16.     <u>Typicality</u>: Plaintiff's claims are typical of those of the Class because all Plaintiffs were injured by the Defendants' uniform wrongful conduct, specifically, using misleading and deceptive

---

state requires proof of individualized reliance, or proof of Defendant's knowledge or intent. Thus, Defendant's conduct alleged herein violates each statute's shared prohibitions.
[2] As that term and label is defined herein.

marketing and advertising in offering and selling the Products to Plaintiffs.

17.     Adequacy:  Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the Class members Plaintiff seeks to represent, Plaintiff has retained competent and experienced counsel, and Plaintiff intends to prosecute this action vigorously. The interests of the Class will be protected fairly and adequately by Plaintiff and his counsel.

18.     Commonality:  Common questions of law and fact exist as to all Class members and predominate over any questions affecting only individual members, such as: (a) whether the Defendant used deceptive or misleading marketing and advertising in selling the Products; (b) whether and to what extent the Class members were injured by Defendant's illegal conduct; (c) whether the Class members are entitled to compensatory damages; (d) whether the Class members are entitled to declaratory relief; and (e) whether the Class members are entitled to injunctive relief.

19.     Superiority:  This class action is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy.  The damages suffered by the individual Class members will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by the Defendant's wrongful conduct.  Thus, it would be extremely difficult for the individual Class members to obtain effective relief.  A class action presents far fewer management difficulties and provides the benefits of a single adjudication, including economies of time, effort, and expense, and uniformity of decisions.

## III.    BACKGROUND

20.     Defendants manufacture, distribute, and/or sell the Products – "Up & Up"-branded cold and flu medicines claiming to be "Non Drowsy," despite containing DXM.

21.     Examples of the Products' packaging are as follows:



a.

22.     As shown, the outside packaging for the Products uniformly claims the Products are "Non-Drowsy" (magnified label example):



23.     The "Non Drowsy" claim, for many of the Products, is also shown in juxtaposition to "Night" versions of Defendants' products that are *not* purporting to be "Non Drowsy."



a.

24.     In this manner, the Products' "Non Drowsy" claims are enhanced in the mind of the consumer, who is left even more with the impression that the Products will not cause drowsiness.

25.     In short, the Products are misleadingly and falsely labeled as being "Non Drowsy," while providing no information for a consumer to determine otherwise.

### *DXM Causes Drowsiness*

26.     Multiple authoritative sources have recognized that DXM causes drowsiness.

27.     For instance, the United States' National Institute of Health ("NIH"), through a service of the National Library of Medicine, MedlinePlus, warns that DXM causes drowsiness.[3]

28.     In fact, on the MedlinePlus source page for "Dextromethorphan" – which specifically lists many of the Products herein under "Brand names of combination products" – in addition to warning of drowsiness caused by DXM, the NIH explains that DXM is an "antitussive … [that] works by decreasing activity in the part of the brain that causes coughing."[4]  In addition to the NIH, other federal governmental organizations recognize the dangers of DXM-caused drowsiness, as the US Federal Aviation Authority ("FAA") advises pilots that they cannot fly while taking products with DXM.[5]  Indeed, the FAA advises that, if a pilot ingests cough medications "containing [DXM], [they] should not fly for at least 5 half-lives after the last dose," which is a *minimum* of thirty hours according to the dosage rate.  In other words, the concern over drowsiness from DXM is so great that pilots must wait at least 30 hours after their last dose of DXM before they should pilot an airplane. *Id.*

29.     Scientific journals and books also consistently list DXM as causing drowsiness.  For instance, in the "Cough, Cold and Allergy" chapter of Applied Pharmacology (2011), discussion of DXM specifically lists its side effects as being "Drowsiness" and "Dizziness."[6] In the same vein, in the "Dextromethorphan" Chapter of xPharm: The Comprehensive Pharmacology Reference, the authors state that "[a]dverse effects produced by dextromethorphan include *drowsiness,* fatigue, [and]

---

[3] https://medlineplus.gov/druginfo/meds/a682492.html (last visited December 11, 2023).
[4] *Id.*
[5] https://www.faa.gov/licenses_certificates/medical_certification/media/OTCMedicationsforPilots.pdf (implementing the FAA's prohibition in 14 CFR sec. 61.53(a)(2) and (b) on flying while having a medical condition or taking medication that would impair the pilot).
[6] Applied Pharmacology, (2011) Chapter 12: Cough, Cold and Allergy, *Stan K. Bard (Pharm), Jason E. Waechter (MD), Douglas Martin (PhD),* pp. 127-129.

dizziness."[7]

30.    Various other authoritative medical sources agree. For example, the Mayo Clinic – a well-known nonprofit American academic medical center focused on integrated health care, education, and research – lists "drowsiness (mild)" as one side effect of DXM, and lists "drowsiness or dizziness" under "side effects occur[ing]" from oral DXM.[8]    Similarly, WedMD – a popular online data-compilation source – lists "slight drowsiness" as something that may occur from DXM usage, but also acknowledges that "some people may experience *severe* drowsiness/dizziness with *normal* doses."[9]

31.    This popular and widely-held consensus was echoed in another study on an alternative to DXM, in which the authors noted that "daytime drowsiness is one of the drawbacks of the centrally acting antitussives [DXM and dihydrocodeine]," and specifically noted the alternative they were comparing to DXM showed "less sedative effects" than DXM.[10]    Similarly, in another study of an alternative to DXM, levodroprizine, the researchers found that DXM caused drowsiness in over 10% of the patients taking DXM orally.[11]

32.    Moreover, according to a 2017 GlaxoSmithKline presentation on drug labeling, a "common" adverse reaction (i.e., side effect) is one that occurs in 3% or more drug takers and a "very common" side effect occurs in 10% or more drug takers. Similarly, Pfizer's safety data sheet for DXM drugs states that "drowsiness" is a "common" adverse reaction associated with "clinical use."[12]    For

---

[7] xPharm: The Comprehensive Pharmacology Reference, (2007), Chapter "Dextromethorphan," Introduction, pp. 1-7.

[8] https://www.mayoclinic.org/drugs-supplements/dextromethorphan-oral-route/side-effects/DRG-20068661 (last visited December 11, 2023).

[9] https://www.webmd.com/drugs/2/drug-363/dextromethorphan-hbr-oral/details  (last visited December 11, 2023)(emphasis added).

[10] Surinder Birring, et al. *Antitussive therapy: A role for levodropropizine,* Pulmonary Pharmacology & Therapeutics 56 (2019)(examining alternative to DXM with less sedative effects).

[11] Ernesto Catena, Luisa Daffonchio, *Efficacy and tolerability of levodropropizine in adult patients with non-productive cough. Comparison with dextromethorphan,* Pulmonary Pharmacology & Therapeutics 10 (1997).

[12]   Pfizer, Safety Data Sheet at page 6, March 25, 2015:

example, one study found that "[s]omnolence is a common side effect of centrally acting antitussive drugs" like dextromethorphan, and that 10.4% of users of products containing dextromethorphan develop drowsiness within three days of starting treatment with DXM cough medicine.[13]  The "cases of intense somnolence" were "related only to dextromethorphan" and not to the other drug studied. And patients in this clinical study were given an even smaller dosage of DXM (15 mg three times a day) than the recommended dose found in many Target products.[14]

33.    Finally, the FDA's adverse event report database confirms that "sedation" is one of the most frequently-cited side effects of dextromethorphan-containing products.[15]

34.    In addition to the above sources recognizing that DXM causes drowsiness, the following ten factors further illustrate that DXM, as a matter of science, causes drowsiness regardless of its intended or purported usage:

a.  **Central Nervous System Depression**: DXM acts on the central nervous system (CNS) to produce its cough suppressant effects.[16]  Specifically, it induces CNS depression, leading to a reduction in brain activity, which causes

---

https://imgcdn.mckesson.com/CumulusWeb/Click_and_learn/SDS_9PFIZ_ROBITUSSIN_DM_SYRP_4OZ.pdf ("Common adverse reactions associated with the clinical use of dextromethorphan hydrobromide include, drowsiness").

[13] E. Catena and L. Daffonchio, "Efficacy and Tolerability of Levodropropizine in Adult Patients with Non-productive Cough, Comparison with Dextromethorphan," 10 Pulmonary Pharmacology & Thimapeutics 89-96 (1997).

[14] The Product contains 20 mg of DXM per 30 ml of syrup and the recommended dosage is 30 ml orally every 4 hours.

[15] Sedation is associated with drowsiness. *See* IV/Monitored Sedation, American Society of Anesthesiologists,  https://www.asahq.org/madeforthismoment/anesthesia-101/types-of-anesthesia/ivmonitored-sedation/ (even "minimal" sedation means that "you'll feel drowsy").

[16] *See, e.g.,* PubMed, NCBI: "Effects of Dextromethorphan on Depressive-and Cognitive-Associated Behaviors," Ijomone, O., *et. al.* (July 2019), available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7101514/; *see also* PubMed, NCBI: "Effect of a Single Dose of Dextromethorphan on Psychomotor Performance and Working Memory Capacity," Al-Kuraishy, H., *et. al.* (June 2012), available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3498776/

drowsiness.[17]

b. **Serotonin Reuptake Inhibition**: DXM has been reported to inhibit the reuptake of serotonin, a neurotransmitter associated with mood and sleep regulation.[18] Increased levels of serotonin can lead to sedative effects, contributing to drowsiness.[19]

c. **NMDA Receptor Antagonism**: DXM is an NMDA receptor antagonist.[20] The NMDA receptor is involved in excitatory neurotransmission.[21] By antagonizing these receptors, DXM can diminish excitatory signals in the brain, leading to sedation.[22]

d. **Histamine Release**: Studies show that DXM causes the release of histamine in the brain, which can have sedating effects.[23] Histamine is commonly

---

[17] *See, e.g.,* Yashoda Hospitals, Dextromethorphan: Frequently Asked Questions, 2023, available at: https://www.yashodahospitals.com/medicine-faqs/dextromethorphan/#:~:text=Yes%2C%20DXM%20is%20a%20central,may%20also%20lead%20to%20coma;

[18] *See, e.g.,* PubMed, NCBI: "Dextromethorphan-induced serotonin syndrome," Schwartz, A., *et. al.* (September 2008), available at: https://pubmed.ncbi.nlm.nih.gov/19238739/ (pointing out that "[t]he ability of [DXM] to potentiate serotonin levels and lead to serotonin syndrome is well known but few case reports are published").

[19] *Id., see also, e.g.,* Science Direct, Dextromethorphan (2024), available at: https://www.sciencedirect.com/topics/nursing-and-health-professions/dextromethorphan ; *see also* PubMed, NCBI: "Physiology, Serotonin," Bamalan, O., *et. al.* (July 30, 2023), available at: https://www.ncbi.nlm.nih.gov/books/NBK545168/ (side effects of increased seratonin include sleepiness).

[20] *Id.*

[21] *See, e.g.,* PubMed, NCBI: "Roles of presynaptic NMDA receptors in neurotransmission and plasticity," Banerjee, A., *et. al.* (December, 2015), available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4716805/#:~:text=Presynaptic%20NMDA%20receptors%20(preNMDARs)%20play,formative%20periods%20of%20brain%20development.

[22] *See, e.g.,* NDMA Receptors in Clinical Neurology: Excitatory Times Ahead, Kalia, Lorraine, et. al., (Aug. 2008) available at NIH National Library of Medicine: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3589564/

[23] *See, e.g.,* United States Department of Transportation, "Dextromethorphan" -- National Highway Traffic Safety Administration Fact Sheet (August 2008), available at: https://web.archive.org/web/20080730021032/http://www.nhtsa.dot.gov/people/injury/research/job185d

associated with inflammatory responses but also plays a role in sleep-wake regulation.[24]

e. **Dopamine Receptor Interaction**: DXM's interaction with dopamine receptors can indirectly affect sleep regulation. Dopaminergic pathways are involved in regulating wakefulness; thus, alterations in dopamine signaling can lead to changes in alertness and potentially cause drowsiness.[25]

f. **Disruption of Sleep Architecture**: DXM use has been associated with alterations in sleep architecture, including changes in rapid eye movement (REM) and non-REM sleep patterns. This disruption can negatively affect sleep quality, leading to a feeling of drowsiness.[26]

g. **Metabolic Effects**: The metabolism of DXM in the liver involves enzymes that can be affected by various factors such as genetic differences, potentially influencing the sedative effects of the drug, rendering it even *more* sedative to roughly 15% of the Caucasian populations.[27]

---

rugs/dextromethorphan.htm

[24] ScienceDirect, "Substances Involved in Neurotransmission, Histamine"; Kapalka, G. (2010), available at:
https://www.sciencedirect.com/topics/psychology/histamine#:~:text=Histamine%20is%20known%20to%20contribute,approach%20used%20to%20induce%20sleep.

[25] *See, e.g.,* PubMed, NCBI: "Effects of dextromethorphan on dopamine dependent behaviours in rats," Gaikwad, R. (August 2007), available at:
https://pubmed.ncbi.nlm.nih.gov/17877148/#:~:text=Dextromethorphan%20at%2015%20and%2030,stereotypy%20and%20antagonizes%20haloperidol%20catalepsy; *see also* PubMed, NCBI: "Effects of dextromethorphan on dopamine release in the nucleus accumbens: Interactions with morphine," Steinmiller, C., *et. al.* (March 2003), available at: https://pubmed.ncbi.nlm.nih.gov/12667894/

[26] *See, e.g.,* PubMed, NCBI: "Effects of dextromethorphan, diphenhydramine, and placebo on nocturnal cough and sleep quality for coughing children and their parents," Paul, Ian. (July 2004), available at:
https://pubmed.ncbi.nlm.nih.gov/15231978/

[27] *See, e.g.,* "Pharmacokinetics/Toxiokinetics," Encyclopedia of Toxicology (Third Edition), Marraffa, J (2014), available at: https://www.sciencedirect.com/science/article/abs/pii/B9780123864543007223; *see also,* NIH, National Library of Medicine (National Center for Biotechnology Information), "Dextromethorphan Toxicity," (June 26, 2023), available at:

h. **Interactions with Other CNS Depressants**: The concomitant use of DXM with other CNS depressants (e.g., alcohol, benzodiazepines, opioids) can enhance its sedative effects, leading to increased drowsiness.[28] Because the Product is labeled "non-drowsy" users are more likely to engage in such concomitant use of other CNS depressants.

i. **Individual Susceptibility**: Individual differences in susceptibility to DXM's effects can result from genetic variations, existing medical conditions, or concurrent medication use, influencing the extent of drowsiness experienced.[29]

j. **Dosage and Administration**: Higher doses of DXM are more likely to cause CNS depression and therefore drowsiness.[30] The form of DXM (e.g., syrup, tablet) and its absorption can also impact its sedative effects. Here, as explained in greater detail *infra,* the dosage and form of DXM delivered by the Product can enhance its sedative side effects as it continues to accumulate in the user's system.

35.    The conclusion that can be drawn from the above is obvious: consumers purchasing and using any of the Products may very likely suffer drowsiness. This could potentially be disastrous for consumers in certain situations, such as those driving, operating heavy machinery, or supervising children and/or important/dangerous operations. Thus, in addition to being illegal under Missouri law

---

https://www.ncbi.nlm.nih.gov/books/NBK538502/

[28] *Id., see also, e.g.,* "What are the side effects of mixing DXM & Alcohol?", American Addiction Centers Editorial Staff (Mar. 2024), available at: https://americanaddictioncenters.org/alcohol/rehab-treatment/mixing-with-dxm

[29] *See, e.g.,* PubMed, NCBI: "The antitussive effect of dextromethorphan in relation to CYP2D6 activity," Manap, Abdul (September 1999), available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2014340/ ("it is well-established that the overall disposition of dextromethorphan is highly dependent upon CYP2D6 activity, which varies widely due to genetic polymorphism").

[30] "7 Dextromethorphan Side Effects to Know," GoodRx.com, Cieri-Hutcherson, N. (Dec. 19, 2022), available at: https://www.goodrx.com/dextromethorphan/dextromethorphan-side-effects

for being deceptive, misleading, unfair and false, Defendants' false claims also are dangerous. A significant portion of consumers will be rendered drowsy by the Products and those consumers are unable to determine on their own if that will happen or not.

36.    Defendants know that the "Non Drowsy" label is a hot selling point and that customers especially want to avoid medicine that could impair their ability to drive by making them drowsy.

37.    Indeed, the gravity of Defendants' false statements is further underscored by the fact that, as noted *supra,* the United States FAA recommends that pilots wait at least *thirty hours* from their last dosage of DXM before piloting an airplane. Nonetheless, disregarding the risk to consumers, Defendants falsely claim the DXM-containing products are "Non drowsy."

38.    Further exacerbating the deleterious drowsiness-inducing DXM effect is the fact that 9% of the population have been shown to be "poor metabolizers" of DXM, which could cause DXM to build up even more-heavily in their circulatory system.[31] Per their DXM metabolic rate (median half-life is 19.1 hours, with an oral bioavailability of 80%), a "poor metabolizer" following package directives of dosing up to six (6) times per day could have as much as 120mg of DXM built up and poorly clearing their system. This could have disastrous results for a consumer that might continue to believe the Products had nothing to do with their ever-increasing drowsiness.

39.    In any event, reasonable consumers do not expect a product prominently labeled as "Non Drowsy" to cause drowsiness. The Products' labels are deceptive and misleading in violation of the Missouri Merchandising Practice Act, and various other Missouri laws.

40.    Reasonable consumers such as Plaintiff do not have specialized knowledge necessary to identify ingredients in the Products (such as DXM) as being inconsistent with Defendant's advertised claim of being "Non Drowsy."

41.    Defendant knows that consumers are willing to pay more for medicines that are labeled

---

[31] https://www.ncbi.nlm.nih.gov/books/NBK538216/

"Non drowsy" because they perceive it to be a better alternative to similar products that may cause drowsiness, and Defendant advertises and sells the Products with the intention that consumers rely on the representation made on the front of the Products' packaging.

42.    Plaintiff and other consumers purchased the Products due to their belief that the Products would not cause drowsiness, and could live up to the "Non drowsy" claim.

43.    Plaintiff and the Class made their purchasing decisions in reliance upon Defendant's advertised claims that that Products are "Non drowsy."

44.    Plaintiff and the Class reasonably and detrimentally relied upon the Products' front labels indicating that the Products are "Non drowsy."  In doing so, Plaintiff at all times acted as a reasonable consumer would have.

45.    Plaintiff and the Class would not have purchased the Products had they known that the Products caused drowsiness, contrary to their claims.

46.    Defendant's conduct threatens Missouri consumers by using false, deceptive, and misleading labels. Defendant's conduct also threatens other companies, large and small, who "play by the rules." Defendant's conduct stifles competition, has a negative impact on the marketplace, and reduces consumer choice.

47.    There is no practical reason for the false or misleading labeling and advertising of the Products, other than to mislead consumers as to the actual effects of the Products being purchased by consumers while simultaneously providing Defendant with a financial windfall.

### *Allegations Relating to All Plaintiffs*

48.    As noted, *supra,* since the initial offering of the Products, the Products have borne one or more uniformly-worded labels falsely claiming the Products are "Non drowsy" (hereinafter "False Claims").

49.    In reality, for all the reasons set forth *supra,* a reasonable consumer would find that the

14

False Claims are false, misleading, unfair, and/or deceptive.

50.    Defendant, as developer, manufacturer, and exclusive seller and distributor of the Products, has been aware since the Products' inception that the False Claims are in fact false.

51.    Indeed, Defendant undoubtedly did its own investigation of the Products and its marketplace prior to it being offered for sale and, of necessity, such investigation would have made Defendant aware that the False Claims are in fact false.

52.    Despite this, Defendants purposely made the False Claims in order to induce the false belief in consumers that they were purchasing a product that was indeed "Non drowsy."

53.    Plaintiff and the class members purchased the Products without being aware that the Products are not, in fact, "Non drowsy."

54.    Defendant possessed specialized knowledge regarding the data and information concerning the formula of the Products and its clams.

55.    In fact, in regard to the False Claims, the Product is a credence good because its purported "Non Drowsy" label cannot be independently verified by the consumer at the time of purchase.

56.    In purchasing the Products, Plaintiff and the class members had no choice but to necessarily and justifiably rely upon the False Claims as accurate.

57.    Had Plaintiffs known that the False Claims were false, Plaintiffs would not have purchased the Products or would not have paid as much for the Products.

58.    If, at some point in the future, the Product was improved to actually be "Non drowsy" Plaintiffs intend to, and will purchase the Products again.

59.    As the direct and proximate result of the False Claims, Plaintiff and the class members have suffered economic injury by being deprived of the benefit of the bargain they were promised by Defendant.

60.     By marketing, selling and distributing the Product to purchasers in Missouri, Defendant made actionable statements that the Products were "Non drowsy," but at all times failed to disclose that the Products caused drowsiness.

61.     Defendant engaged in the above-described actionable statements, omissions and concealments with knowledge that the representations were false and/or misleading, and with the intent that consumers rely upon such concealment, suppression and omissions.

62.     Alternatively, Defendant was reckless in not knowing that the False Claims were false and misleading at the time they were made.

63.     As the distributor, marketer, producer, manufacturer, and seller of the Products, Defendant possessed specialized knowledge regarding the data and information concerning the chemical formula of the Products which the Plaintiff and the class members could not and did not review.

64.     All of Plaintiffs' claims are based on misleading statements that violate FDA regulations. Such claims do not seek to impose any additional or different obligations beyond those already required by such FDA regulations.

65.     In fact, neither the FDCA, nor the regulations promulgated thereunder address whether a "non drowsy" claim is proper in connection with cough suppressants with DXM.  The FDA has not yet required a drowsiness warning for DXM.  Likewise, the FDA has never approved a "non drowsy" claim. Consequently, as already determined by fellow Eighth-Circuit district courts reviewing this exact issue, none of Plaintiffs' claims in this action are preempted by the FDCA or any regulation promulgated thereunder.

*Facts Particular to Named Plaintiff*

66.     In or around October 17, 2023, Plaintiff purchased one of the Products directly from a physical Target establishment in St. Louis County, Missouri, 4255 Hampton Avenue.  Specifically, Plaintiff purchased the "Up & Up" daytime cold and flu (12fl. oz. liquid):



67.    Due to the claims on the packaging, Plaintiff falsely believed he was purchasing a product that had a "Non drowsy" formula, and would not cause drowsiness. Because Plaintiff did not want to become drowsy, Plaintiff deliberately chose a "non drowsy" product.

68.    Plaintiff thereafter purchased the Product.  Plaintiff purchased the Product primarily for Plaintiff's personal, family and household use.

69.    At the time Plaintiff purchased the Product, Plaintiff was unaware of the falsity of the Products' claims.

70.    Plaintiff discovered that such claims were false only after purchasing and using the Product, which Plaintiff used properly and according to its instructions in every respect.  After taking the recommended dosage, Plaintiff became considerably drowsy in an unexpected, unnatural manner. Plaintiff could not attribute this unexpected drowsiness to anything other than the Product.  There were no other factors that would have caused Plaintiff to be drowsy at such time. The drowsiness Plaintiff experienced was particularly worrisome as it caught Plaintiff unexpectedly while driving.

71.    If Plaintiff had been aware of the falsity and misleading nature of Defendant's claims regarding the Product, Plaintiff would not have bought the Product.

72.    When Plaintiff purchased the Product, Plaintiff was injured by Defendant's illegally deceptive, false, and misleading conduct in marketing and selling the Product.

73.    Specifically, Plaintiff suffered an ascertainable loss because Plaintiff did not receive the

expected benefit of the bargain.

74.    When Plaintiff was purchasing the Product, due to the false claims upon the Product, Plaintiff believed that Plaintiff was receiving a product with a formula that was, in fact, "Non drowsy." The Product did not do what Plaintiff bargained for, however. Plaintiff became drowsy in an unexpected and unnatural manner after ingesting the Product.  Plaintiff's drowsiness lasted several hours and was a significant impediment to Plaintiff's activities at the time, including operating a motor vehicle.

75.    The Product was not what it was purported to be.  Plaintiff did not receive the value of what Plaintiff bargained for; instead Plaintiff received a product that did not live up to one of its most-prominently advertised benefit.

76.    Consequently, Plaintiff was damaged in the amount of the difference between the cost paid for the Product as represented – as one that was "Non drowsy," and the actual value of the products.  Said difference for most Plaintiffs would therefore be a percentage of the price paid for the Product.

77.    Plaintiff desires to and absolutely will purchase the Products again if they were actually non-drowsy but faces an imminent threat of harm because Plaintiff will not be able to rely on Defendant's labels in the future (without relief) and will thus be unable to purchase the Products.

78.    Although the aforementioned facts apply to named Plaintiff, for purposes of the proposed Class, all that is relevant is that Plaintiff and the class members, Missouri citizens, each and all purchased the Products at a time within the Class Period while in Missouri or another state in the Consumer Protection Subclass.

**CAUSES OF ACTION**

**COUNTS RELATING TO THE MISSOURI CLASS**

**COUNT ONE: BREACH OF WARRANTY UNDER MISSOURI LAW**

79.     Plaintiff hereby incorporates by reference and re-alleges each allegation set forth in each preceding paragraph of this Class Action Petition.

80.     Defendant sold the Product in its regular course of business.  Plaintiff and the class members purchased the Product.

81.     Defendant made promises and representations in an express warranty provided to all consumers, namely the False Claims.

82.     The False Claims became the basis of the bargain between the Defendant and Plaintiff and each class member.

83.     Defendant gave these express warranties to Plaintiff and each class member in written form on the labels of the Product.

84.     Defendant's written affirmations of fact, promises, and/or descriptions as alleged are each a written warranty under Missouri law.

85.     Defendant breached the warranty because the False Claims were false – the Product was not "Non drowsy."

86.     The False Claims were false when the sales took place and were undiscoverable to Plaintiff and the class members at the time of purchase.

87.     All conditions precedent to seeking liability under this claim for breach of express warranty have been performed by or on behalf of Plaintiff and the class in terms of paying for the Product.

88.     Defendant had actual notice of the false labeling information and to date has taken no

19

action to remedy its breach of express and implied warranty.

89.     Specifically, on January 24, 2024, counsel for Plaintiff e-mailed to counsel for Defendant written NOTICE of Defendant's breach of express warranty by way of an almost exact copy of this Petition.  Defendant still has not meaningfully responded, and has taken no action to remedy its breach of express and implied warranties.

90.     In addition, Defendant previously knew or should have known of the falsity of the False Claims on the Product due to, *inter alia,* Defendant's testing and knowledge of the Product.

91.     Defendant has nonetheless refused to remedy such breaches.

92.     By placing the Product in the stream of commerce, and by operation of law and the facts alleged herein, Defendants also impliedly warrantied to Plaintiff and the class members that the Products were accurately labeled in conformance with the law.

93.     Defendant's breaches of warranty have caused Plaintiffs and class members to suffer injuries, paying for falsely labeled products, and entering into transactions they otherwise would not have entered into for the consideration paid.  As a direct and proximate result of Defendant's breaches of warranty, Plaintiff and class members have suffered damages and continue to suffer damages.

94.     As a result of Defendant's breach of these warranties, Plaintiff and class members are entitled to legal and equitable relief including damages, costs, attorneys' fees, rescission, and/or other relied as deemed appropriate, in an amount sufficient to compensate them for not receiving the benefit of their bargain.

## COUNT TWO: BREACH OF IMPLIED CONTRACT UNDER MISSOURI LAW

95.     Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

96.     By operation of law, there existed an implied contract for the sale of the Product between Defendant and Plaintiff and each class member who purchased the Product.

20

97.     By operation of Missouri law, there existed an implied duty of good faith and fair dealing in each such contract.

98.     By the acts alleged herein, Defendant has violated that duty of good faith and fair dealing, thereby breaching the implied contract between Defendant and each class member.

99.     As a result of that breach, Plaintiff and each class member suffered damages.

## COUNT THREE: UNJUST ENRICHMENT UNDER MISSOURI LAW

100.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

101.    Plaintiffs plead their claim for relief in the alternative to the contract claims set forth above.

102.    Plaintiff and the class members have conferred substantial benefits on Defendant by purchasing the Product, and Defendant has knowingly and willfully accepted and enjoyed those benefits.

103.    Defendant either knew or should have known that the payments rendered by Plaintiff and the class members were given and received with the expectation that the Product would be as represented and warranted.  For Defendant to retain the benefit of the payments under these circumstances is inequitable.

104.    Through deliberate misrepresentations or omissions in connection with the advertising, marketing, promotion, and sale of the Products, including the False Claims, Defendant reaped benefits, which result in Defendant wrongfully receiving profits.

105.    Equity demands disgorgement of Defendant's ill-gotten gains.  Defendant will be unjustly enriched unless Defendant is ordered to disgorge the unjustly obtained portion of profits for the benefit of Plaintiff and the class members.

106.    As a direct and proximate result of Defendant's wrongful conduct and unjust enrichment, Plaintiffs and the class members are entitled to restitution from Defendant and institution of a

constructive trust disgorging all profits, benefits, and other compensation obtained by Defendant through this inequitable conduct.

## COUNT FOUR: VIOLATION OF THE MMPA & OTHER CONSUMER PROTECTION LAWS

107.    Plaintiff hereby incorporates by reference and re-alleges each allegation set forth in each preceding paragraph of this Class Action Petition, as though fully set forth herein.

108.    Defendant's acts complained of herein occurred in and emanated from the State of Missouri.

109.    Plaintiff and all members of the Class are "persons" and the Products are "merchandise" as those terms are defined under the MMPA.

110.    Defendant's marketing of the Product constitutes deception, false pretense, misrepresentation, unfair practice, or, at a minimum, the concealment, suppression, or omission of a material fact in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. chap. 407 ("MMPA").

111.    As a result of Defendant's actions, consumers, including Plaintiff, were misled or deceived that the Product they were purchasing was one with a "Non drowsy" formula.

112.    Defendant's deceptive acts caused Plaintiff and the Class Members an ascertainable loss within the meaning of the MMPA.

113.    Due to Defendant's illegal conduct, Plaintiffs are entitled to restitution of all funds improperly obtained by Defendants.

114.    In being misled in the manner described herein, Plaintiff was at all times acting as a reasonable consumer would in light of the circumstances.

115.    The deceptive practice Defendant engaged in would cause a reasonable person to enter the transaction described herein, which resulted in damages to Plaintiff.

116.    Plaintiffs have been forced to hire attorneys to enforce their rights under the MMPA.

117.    For all of the same reasons set forth above, Defendants' conduct also violates the materially-similar consumer protection laws of the Consumer Protection Subclass:

      a.  Illinois:  815 ILCS § 501/1, *et. seq.*

      b.  Maryland: Md. Code Ann. Com. Law, § 13-301, *et. seq.*

      c.  Hawaii: Haw. Rev. Stat. § 480-2, *et. seq.*

      d.  New York: N.Y. Gen. Bus. Law § 349, *et. seq.*

      e.  Washington D.C.: D.C. Code § 28-3901, *et. seq.*

      f.  Rhode Island: R.I. Gen. Laws § 6-13..1- 5.2(B), *et. seq.*

      g.  Vermont: 9 V.S.A. § 2451, *et. seq.*

      h.  Washington: Wash. Rev. Code § 19.86.010, *et. seq.*

      i.  Connecticut: Conn. Gen. Stat. Ann. §§ 42-110, *et. seq.*

("Consumer Protection Statutes")

118.    Accordingly, just as the MMPA has been violated by Defendant as alleged herein, each of the above Consumer Protection Statutes, all materially-similar to the MMPA, have also been violated by Defendants.

119.    Each of these Statutes is materially similar to the MMPA. Each broadly prohibits deceptive conduct in connection with the sale of goods to consumers. No state requires proof of individualized reliance, or proof of Defendant's knowledge or intent. Instead, it is sufficient that the deceptive conduct is misleading to reasonable consumers and that the conduct proximately caused harm. Defendant's conduct violates each statute's shared prohibitions.

120.    Plaintiff hereby re-incorporates herein the preceding facts that satisfy all of the various elements of each of the Consumer Protection Statutes.

121.    Each of the Consumer Protection Statutes prohibits unfair, unconscionable, and/or deceptive acts or practices in the course of trade or commerce or in connection with the sales of goods or

services to consumers. Defendant's conduct violates each statute's prohibitions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for an order certifying this action as a Consumer Protection Subclass and/or Missouri Subclass class action, and appointing Plaintiff as Class and/or Subclass representative and Plaintiff's counsel as class and/or subclass counsel. Plaintiff requests that this court find that the Defendant is liable pursuant to the aforementioned common law claims; and/or violated the MMPA and/or the Consumer Protection Statutes, and award Plaintiffs compensatory damages, restitution, punitive damages, and attorneys' fees, and such further relief as the Court deems just, including injunctive relief

Respectfully submitted,

**DANIEL F. HARVATH, ESQ.**

By: /s/ *Daniel F. Harvath*
Daniel F. Harvath, #57599MO
**HARVATH LAW GROUP, LLC**
75 W. Lockwood, Suite #1
Webster Groves, MO 63119
(314) 550-3717
dharvath@harvathlawgroup.com
*Attorney for Plaintiff*

24